CARAWAY, J.
liA unanimous jury found Moses Parker guilty as charged of aggravated rape in violation of La. R.S. 14:42. Parker was sentenced to mandatory life imprisonment at hard labor, without benefit of probation, parole, or suspension of sentence. He now appeals his conviction. We affirm.

Facts

On October 6, 2006, Monroe police officers responded to a call regarding the rape of a 12-year-old girl at a local apartment complex. The victim was walking through the complex when she was approached by a man. In that initial conversation, the man asked the girl to go to a trailer park and into the woods, and she refused. She left to play ball with friends for approximately 25 minutes. As she left the group to obtain a drink, and walked through the apartment complex again, she encountered the man a second time. He led the girl to believe that something was wrong with him and directed her behind an apartment building where he raped her. The child described her assailant as a black skinny male wearing striped clothing and shorts.
Two witnesses told police they saw Parker and heard him speaking to the girl not long before the offense occurred. Both witnesses informed Parker that the girl “was just a kid.” One of those witnesses claimed she spoke with the girl after the incident. The child told the witness that *518 the man who raped her was the same man who had talked to her earlier.
1¡¡From the witnesses’ descriptions, police developed Parker as a suspect and located him at his home in a trailer park adjacent to the apartment complex. Parker was transported to the police station where the investigating detective explained to Parker his rights before he signed the waiver of rights form. Parker then gave a statement in which he admitted having sex with the victim, but claimed that it was consensual and that he thought she was 17. The victim never identified Parker as her assailant at the time of the offense, and due to an oversight of the police department, no DNA testing was performed on the rape kit or defendant.
On October 26, 2006, a grand jury indicted Parker for the aggravated rape of 12-year-old K.S. on October 6, 2006. On November 15, 2006, the defendant filed a motion to appoint a sanity commission on the grounds that mental illness rendered him incapable of understanding the nature of the charges against him or assisting in the preparation of his defense. Specifically, Parker contended that at the time of the offense he was incapable of discerning right from wrong due to his schizophrenia and the fact that he had stopped taking his prescribed medication almost two weeks prior to the offense.
The court appointed a sanity commission but on April 3, 2008, Parker was found competent to stand trial. Nevertheless, on December 7, 2009, defense counsel' filed a motion to commit Parker to a state hospital based on the evaluations of sanity commission physicians and his own experiences in meeting with Parker to prepare his defense. Counsel argued that Parker was incapable of understanding the charges or proceedings and was unable to | ¡¡assist in his defense. The court ordered another expert evaluation of Parker by a clinical psychologist and neuropsychologist. After this expert concluded that Parker was not competent to stand trial, on March 15, 2010, the court ordered Parker committed to the state hospital, to be held until the hospital determined that he was able to assist in his defense. He was involuntarily committed on July 30, 2010.
On February 16, 2011, after hospital treatment and evaluation, the court found Parker competent to stand trial. Parker maintained a plea of not guilty and declined a dual not guilty/insanity plea. In pretrial proceedings the trial court ruled any expert reports regarding Parker’s mental capacity inadmissible for trial.
On February 22, 2012, the trial court heard the defendant’s December 2, 2009 motion to suppress. Parker argued in part that his mental and emotional status rendered him incapable of fully understanding his rights when he signed the waiver form.
Corporal Tracy Heath, lead investigator of the Monroe Police Department, testified for the defense about her interview with Parker on October 6, 2008. Heath said she explained the Miranda[1] rights form. Parker signed the form and then gave a statement. He told her he had finished the 7th grade, had participated in Job Corps and attended trade school.
Parker told the officer that earlier that morning he drank some gin and smoked marijuana. Heath reported however that Parker did not appear |4intoxicated at the police station. His eyes were not bloodshot, his speech was not slurred, and he *519 seemed to understand everything Heath said to him. Parker told her that he took a nap about noon that day, awoke around 8:00 p.m., and was on his way to the store when the offense occurred.
Parker told Heath about four medications he was supposed to be taking but had not taken for over a week. Heath did not know if Parker was telling the truth. Parker indicated to Heath that he guessed he was depressed. As a trained officer and licensed emergency medical technician, Heath knew the medications were for mental disorders such as bipolar or schizophrenia. Heath had dealt with schizophrenics before. She believed Parker answered all of her questions “normally,” recalled the details of the offense without difficulty, and appeared fine. Heath did not feel a medical evaluation was necessary since Parker appeared to understand everything and signed the form. Heath admitted that Parker indicated that his “mind play[ed] tricks on him” in the past. Parker admitted that he had sex with the 12-year-old victim, but said he thought it was voluntary on her part and he thought she was 17.
The state offered into evidence the rights form signed by Parker. No other evidence or testimony was presented by either the defense or the state.
After considering this testimony and reviewing the rights waiver form,' the trial court denied the motion to suppress. The defense objected to the ruling.
Trial on the merits began on July 23, 2012, with the testimony of the victim, who was by then 18 years old. She testified to the facts noted above. | ¡Additionally, she described a concrete slab off a rear door where the offense occurred. She said the man unfastened his pants, grabbed her hand, and put it on his genitals. He then grabbed her head and pushed it down, but she resisted. The man pulled the victim’s pants down and tried to give her oral sex. She said she felt paralyzed and did not move. He put his penis in her vagina and said weird things like “ride like a soldier,” and “I love you.” The victim testified that she felt the worst pain she had ever felt in her life and began crying. The man then stopped and began masturbating. She saw him ejaculate on the ground in the grass. She refused his attempt to give her money and walked her bike home, where she collapsed on the ground shaking. The victim described the man and his clothing, and said he had a low-cut shaved head and smoker’s breath. She said she was a virgin at the time, and did have some bleeding later on. The victim was not asked to identify Parker as her assailant at trial.
Three Monroe Police Department officers testified. Sergeant Charles Johnson stated that he took the victim’s statement and her description of her attacker. He transported Parker to the police station[2] while the victim was taken to the hospital for treatment. Sergeant Cassandra Wooten testified that she also investigated the rape complaint and located Parker at his home. Officer Chris Medaries testified that he was dispatched to the scene and talked to witnesses. Based upon his conversations with the witnesses, Parker was developed as a suspect. He advised Parker of his rights after he | (iwas located by another officer. Medaries obtained consent from Parker to search his house and obtained a shirt Parker wore earlier in the evening.
Amanda McKoin testified that on October 6, 2006, she lived in the apartment complex and was outside that day walking to the store with her sister-in-law. *520 McKoin identified Parker in court and said that he had approached the two of them that day and was trying to talk to her sister-in-law. During that time, the victim rode up to them on her bicycle. McKoin said Parker made a comment about the victim and the two women told him she was just a kid. Later the two women saw people gathered in a group talking about a rape. McKoin testified that she approached the girl and asked if her attacker was the same guy she had seen talking to them earlier. The girl answered yes. McKoin said that she had seen Parker twice before.
Officer Heath testified that she first spoke with the victim at the hospital, where the rape kit was performed. She stated that normally DNA samples were collected during the rape kit and from the suspect to be sent for testing, but that was not done here.
Heath repeated her testimony regarding Parker’s waiver of rights and his confession as given at the motion to suppress hearing. She identified the DVD recording of her interview of Parker; it was introduced into evidence and played for the jury. Heath testified that although Parker did not answer verbally regarding his understanding of the rights read to him, he signed the form and indicated his understanding of the rights then. Heath was questioned regarding Parker’s schizophrenia and medication. She again replied that Parker told her he had not taken his drugs for a week or so. She 17also testified about his drinking and smoking marijuana on the morning of the event.
In the recording shown to the jury, Parker appeared calm and removed his hat as Heath entered the room. Heath asked Parker if he had been advised of his Miranda rights before and said she would review the rights with him. She handed him a written copy of the waiver and asked Parker to read along with her as she read each one out loud. She advised that he was there because of the rape claim. After she read each right out loud, Parker nodded and said “yes, ma’am.” After reading all the rights, she said “If you understand these rights, please initial each one and sign at the bottom.” Heath then asked Parker if he wanted to talk about what happened. Parker initialed and signed the rights waiver form.
Parker did not appear to be visibly agitated. He answered the detective’s questions appropriately and admitted that he knew why he was there. Parker stated that he was 30 years old, had finished the 7th grade, lived in the trailer park, and for income received a disability check. He said that morning he had some coffee with his neighbors and saw some of his cousins. About noon he went in to take a nap. At approximately 3:00 p.m., he headed to the store when he saw the victim riding her bicycle. They exchanged greetings and then had a conversation. Parker said she told him she was from Washington, was leaving on Saturday, and she was 17 but turning 18 on November 8th. He saw two women walking down the sidewalk, a black woman talking to a white woman. They said hello and the white woman asked him for a cigarette. After a while, everyone left. He | slater saw the victim again and said to her, “Come here for a second.” Parker admitted that he had sex with a girl and that the girl was the one claiming that he raped her. Parker said that after he led her to the area between the building and the fence line, the victim came on to him and initiated every sexual act. He claimed that she undid his clothes, took off her own clothes, initiated the oral sex on him as well as the sexual intercourse.
Heath told Parker that one witness told police that she had informed him that the girl was “too young.” Parker insisted that *521 the victim told him that she was 17 and that he had told her he could get into trouble. He said that after looking at her body, he did not think she was younger.
Parker said he did not use a condom and was last tested for HIV about four months before. He admitted he was on probation. The officer asked him what medication he was taking and he told her, but said he had not taken any medication for 1½ weeks. When she asked him what he took the medicine for, he rambled on a bit.
He described the events in detail, and said that he continued having sex until she told him to stop. She said she had to get home. He did not ejaculate inside the victim so he masturbated. The victim rode off on her bike. He went to the store, went home, and changed his shirt.
Parker told Heath that he did not know his statements were being recorded, but admitted that he saw her hit the record button on the recording device. He explained that he was not paying attention and then verbally acknowledged his understanding that his statements were recorded.
After Heath’s testimony, the state rested. The defense presented no |9evidence.
On July 26, 2012, a unanimous jury found Parker guilty as charged. A presen-tence investigation report was ordered and Parker appeared for sentencing on October 4, 2012. The trial court imposed the mandatory sentence of life imprisonment at hard labor, without benefit of probation, parole, or suspension of sentence. Parker has appealed raising one assignment of error.

Discussion

On appeal, Parker argues only that the trial court erred in denying his motion to suppress his statement, considering that he has only a 7th grade education with an IQ of 79, suffers from schizophrenia and at the time of his offense had stopped taking his prescribed medications. He contends that even though he signed the waiver of rights form, he did not understand the rights and thus the state failed to meet its burden to prove that his confession was “knowingly” made. Parker argues that the psychological evaluations establish that his mental status was compromised by his condition and that he was'incapable of understanding his rights in order to make a knowing and informed waiver.
La.C.Cr.P. art. 703 states, in pertinent part, that a defendant may move to suppress a confession or statement of any nature made by the defendant and the burden of proof is on the defendant to prove the ground of his motion, except that the state shall have the burden of proving the admissibility of a purported confession or statement by the defendant.
ImGenerally, for a confession to be admissible into evidence, the state must affirmatively show that it was freely and voluntarily given without influence of fear, duress, intimidation, menace, threats, inducements, or promises. La. R.S. 15:451; State v. Anderson, 06-2987 (La.9/9/08), 996 So.2d 978, cert. denied, 556 U.S. 1165, 129 S.Ct. 1906, 173 L.Ed.2d 1057, 77 USLW 3441 (2009). The state must also establish that an accused was advised of his constitutional rights, state and federal, and that he understood and knowingly waived those rights. Anderson, supra. Voluntariness is determined on a case-by-case basis, under a totality of the circumstances standard. Id.
At a hearing on a motion to suppress a confession, the state bears the burden of proving, beyond a reasonable doubt, the free and voluntary nature of the confession. State v. Hills, 354 So.2d 186 (La.1977); State v. Roddy, 33,112 (La.App.2d Cir.4/7/00), 756 So.2d 1272, writ *522 denied, 00-1427 (La.5/11/01), 791 So.2d 1288. Testimony of the interviewing police officer alone may be sufficient to prove that the statement was given freely and voluntarily. State v. Bowers, 39,970 (La.App.2d Cir.8/19/05), 909 So.2d 1038.
In reviewing the correctness of the trial court’s pretrial ruling on a motion to suppress, the appellate court may consider all pertinent evidence adduced at trial. State v. Brooks, 92-3331 (La.1/17/95), 648 So.2d 366;[3] State v. Martin, 595 So.2d 592 (La.1992); State v. Young, 39,546 (La.App.2d Cir.3/2/05), 895 So.2d 753. A trial court’s finding as to the free and voluntary nature of a statement carries great weight and will not be disturbed unless the evidence fails to support the trial court’s determination. State v. Holmes, 06-2988 (La.12/2/08), 5 So.3d 42, cert. denied, 558 U.S. 932, 130 S.Ct. 70, 175 L.Ed.2d 233 (2009). Accordingly, this court reviews the district court’s ruling on a motion to suppress under the manifest error standard for factual determinations, while applying a de novo review to its findings of law. State v. Hemphill, 41,526 (La.App.2d Cir.11/17/06), 942 So.2d 1263, writ denied, 06-2976 (La.3/9/07), 949 So.2d 441; State v. Marshall, 46,457 (La.App.2d Cir.8/10/11), 70 So.3d 1106.
Low intellect, moderate mental retardation or diminished mental capacity does not, per se, vitiate capacity to make a free and voluntary statement or a knowing and intelligent Miranda waiver. Anderson, supra; Brooks, supra; State v. Benoit, 440 So.2d 129 (La.1983); State v. Lindsey, 404 So.2d 466 (La.1981). Schizophrenia does not automatically render a defendant’s statements inadmissible. State v. Perry, 502 So.2d 543 (La.1986), cert. denied, 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 156 (1987); State v. West, 408 So.2d 1302 (La.1982); State v. Jones, 376 So.2d 125 (La.1979); State v. Sims, 02-1244 (La.App.5th Cir.4/29/03), 845 So.2d 1116, writ denied, 03-2189 (La.8/20/04), 882 So.2d 570. Where sanity is an issue (specifically schizophrenia), in the context of a proceeding to determine the voluntariness of a confession, the state must prove that the defendant’s mental defect did not preclude the voluntary giving of a confession. Jones, supra. See also, State v. Coleman, 395 So.2d 704 (La.1981).12 A defendant’s prior experience with the criminal justice system is a factor to be considered in determining the voluntariness of a confession. State v. Green, 94-0887 (La.5/22/95), 655 So.2d 272; State v. Ashworth, 554 So.2d 271 (La.App. 3d Cir. 1989), writ denied, 561 So.2d 113 (La.1990).
Our review of the expert reports submitted at Parker’s sanity hearings establishes Parker’s schizophrenia. Of those four experts, three concluded that at the time of the offense, Parker was not suffering from a mental disorder which rendered him incapable of knowing right and wrong. The fourth expert was unable to render an opinion on this fact. One of the experts described schizophrenia as a disorder in which the individual experiences times of clear thinking and has the ability to recall relevant facts.
Testimony by Officer Heath, as well as the recorded interview, show that Parker was behaving normally, easily answered all questions asked of him, and was able to recall the details of the event. Officer Heath did not observe any behavior that indicated to her that a mental evaluation of Parker was necessary. Upon review of *523 the rights, Parker read along and nodded after each one. Parker showed no signs of confusion. Given Parker’s 27 prior arrests, he was familiar with the rights that had been explained to him before. He initialed each right and then signed the form. Thereafter Parker was able to provide a detailed narrative of his actions earlier that day which corresponded to those facts given by the victim with the exception of her consent and his belief that the girl was 17. He did so with a coherent | ^recollection of specific and relevant events. Overall, he exhibited clear thought processes.
When viewed in light of the entire record, we find the evidence sufficient to sustain the state’s heavy burden or proving a knowing and intelligent waiver. Considering the officer’s observations, Parker’s apparent understanding of the circumstances as evidenced by the recorded statement, his familiarity with the judicial system and the expert’s conclusions regarding his ability to discern right from wrong at the time of the crime, we find no error in the trial court’s determination that despite Parker’s schizophrenia, he was capable of knowingly and intelligently waiving his rights and freely and voluntarily made his confession.
CONVICTION AND SENTENCE AFFIRMED.

. These rights were set forth in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Johnson had no independent recollection of the facts surrounding Parker’s statement at the police station, which was made in his presence.

. In Brooks, supra, the court considered the testimony of five mental health experts who testified at pretrial hearings and reports of mental health experts appointed on a sanity commission.